## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REVILLE TIRE CO.** *doing business as* **REVILLE WHOLESALE DISTRIBUTING, R.T.C. WAREHOUSE LTD., ROBERT J. REVILLE, RAYMOND L. REVILLE, SUSAN L. REVILLE, RICHARD H. REVILLE, MICHAEL J. REVILLE, ROBERT SEMAN, SUSAN SEMAN, and JOSEPH KIGGINS,** | ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs/Counter Defendants,** | ) ) | |
| v. | ) ) | **Civil Action No. 15-1036** **Chief Magistrate Judge Maureen P. Kelly** |
| **JAMES RANALLI, SR., JAMES P. RANALLI, UAS HERMITAGE OPERATIONS, LLC, UNITED AUTO SUPPLY OF SYRACUSE, WEST, INC., and UAS HERMITAGE REALTY, LLC,** | ) ) ) ) ) ) | **Re: ECF Nos. 109 and 112** |
| **Defendants/Counterclaimants.** | ) | |

---

| | | |
|---|---|---|
| **UNITED AUTO SUPPLY OF SYRACUSE, WEST, INC.,** | ) ) ) | |
| **Counterclaimant,** | ) ) | |
| v. | ) ) | **Civil Action No. 15-1036** |
| **REVILLE TIRE CO., ROBERT J. REVILLE, RAYMOND L. REVILLE, SUSAN L. REVILLE, RICHARD H. REVILLE, MICHAEL J. REVILLE, ROBERT SEMAN, SUSAN SEMAN, and JOSEPH KIGGINS** | ) ) ) ) ) ) ) | |
| **Counterclaim defendants.** | ) | |

## OPINION

**KELLY, Chief Magistrate Judge**

## I.    INTRODUCTION

This action was brought by Reville Tire Co., an Ohio Corporation, its related entity R.T.C. Warehouse LTD., and the individual shareholders/principals of the Reville Tire Co. against UAS Hermitage Operations, LLC, United Auto Supply of Syracuse West, Inc., and UAS Hermitage Realty, LLC, New York entities, and two corporate principals.  Reville Tire Co. had been a financially distressed company for several years prior to meeting with UAS to explore the possibility of UAS providing the company with financial and other assistance.  The parties negotiated an Asset Purchase Agreement ("APA") whereby UAS would purchase certain assets and assume certain liabilities from the Reville Tire Co.  The APA was signed on June 23, 2015, and provided UAS with a due diligence period prior to closing on the agreement.  The APA also permitted UAS to terminate the agreement prior to the closing if it was not satisfied with the results of its due diligence.  On July 28, 2015, UAS terminated the APA, and on August 7, 2015, Reville Tire Co. filed the instant lawsuit.

Plaintiffs allege that Defendants fraudulently induced Plaintiffs to enter into the APA as a ruse to take control of the Reville Tire Co. business without having to honor the contract. Defendants, in turn, assert Counterclaims against Plaintiffs arising out of the same set of circumstances.  Pending before the Court are the parties' cross-motions for partial summary judgment.  As more fully explained below, Plaintiffs' motion for summary judgment will be denied, and Defendants' motion for summary judgment will be granted.

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. Parties

Plaintiff Reville Tire Co., doing business as Reville Wholesale Distributing, ("Reville Tire") is the owner and operator of an automobile parts wholesale, distribution, and warehousing business with locations in Ohio and Pennsylvania. Plaintiff R.T.C. Warehouse Ltd. is an affiliated company of Reville Tire with a warehouse facility on a parcel of land in Hermitage, Pennsylvania. Plaintiffs Robert J. Reville, Raymond L. Reville, Susan L. Reville, Richard H. Reville, Michael J. Reville, Robert Seman, Susan Seman, and Joseph Kiggins are suing as individual shareholders of Reville Tire (collectively the "Reville Principals").

Defendant companies are United Auto Supply of Syracuse, West, Inc. ("UAS"), a seller and distributor of automotive parts and accessories, and its related entities UAS Hermitage Operations, LLC and UAS Hermitage Realty, LLC. The two individual Defendants are a father and son, both named James Ranalli. Plaintiffs identify the father as "James Ranalli, Sr." and the son as "James P. Ranalli." In their pleadings Defendants state that the father's name is "James Ranalli," and the son's name is "James Ranalli, III."

### B. Factual Background

The substantive factual allegations between the parties occurred from June 5, 2015 through July 28, 2015. Relevant to resolving the current cross-motions for summary judgment are Reville Tire's financial condition prompting the negotiations with UAS; the negotiations between the parties; the terms of the APA; events occurring after the APA was signed prior to termination of the agreement; and the Reville Principals interactions with a non-party, Kenneth Lanci.

### 1. Reville Tire's Financial Condition

Reville Tire, an automotive parts supplier, formerly operated in six locations across Ohio and Pennsylvania. ECF No. 114 ¶ 2. Reville Tire sustained losses in fiscal years 2012, 2013 and 2014. *Id.* ¶ 3. From 2012 through 2015, Reville Tire sought advice from multiple financial advisors and turn-around specialists, and also attempted to seek a merger with, or acquisition by, multiple companies. *Id.* ¶¶ 4, 5.

As of May 2015, Reville Tire owed substantial sums to creditors, including more than $2 million to one of its auto parts supply vendors. *Id.* ¶ 9. Members of the Reville family had loaned approximately $2.5 million to Reville Tire. *Id.* ¶ 10.

PNC Bank, N.A., a Reville Tire lender, held a perfected security interest in Reville Tire assets, including but not limited to its inventory and general intangibles. *Id.* ¶ 7. On May 21, 2015, PNC Bank commenced a lawsuit against Reville Tire in which it sought to confess judgment against the company in the amount of $1,406,398.31, plus interests and costs, after Reville Tire defaulted on a line of credit. *Id.* On May 28, 2015, judgment was entered against Reville Tire in favor of PNC Bank in the amount of $1,406,398.31, plus interests and costs. *Id.* ¶ 8. Satisfaction of Judgment was entered on the docket on June 26, 2015. *PNC Bank Nat. Assoc. v. Reville Tire Co.*, No. 5:15-cv-01024 (N.D. Ohio 2015) (ECF No. 10).

### 2. Reville Tire and UAS's Asset Purchase Agreement

On June 5, 2015, representatives of UAS and Reville Tire met to discuss the possible purchase by UAS of some of Reville Tire's assets. ECF No. 114 ¶ 14. The UAS representatives first toured a Reville Tire warehouse in Hermitage, Pennsylvania, and then had a meeting with Richard Reville, Robert Reville, Michael Reville, Raymond Reville, and Kenneth Lanci, a

relative of one of the Reville Principals through marriage. *Id.* ¶¶ 15, 11. Mr. Lanci arrived after the meeting began and was introduced as an advisor. *Id.* ¶ 16. James Ranalli, the father, testified that he left the meeting after Mr. Lanci arrived because he "did not like him" and would "not do business with him." ECF No. 115 at 42. He also testified that one of the Reville Principals followed him out of the meeting and told him that "Mr. Lanci does not own any of the company." *Id.*

On June 12, 2015, UAS provided Reville Tire with a draft of an Asset Purchase Agreement ("APA") in which UAS proposed to purchase certain assets of Reville Tire. ECF No. 114 ¶ 17. Between June 12 and June 18, 2015, Reville Tire, the Reville Principals and their attorney reviewed and discussed the draft APA. *Id.* ¶ 18. Reville Tire's counsel and the individual Plaintiffs drafted a "Memorandum" during this time period addressing certain matters with respect to the APA. ECF No. 124 ¶ 1. Mr. Lanci also reviewed the draft APA and discussed it with some of the Reville Principals. ECF No. 114 ¶ 19. Reville Tire's attorney provided comments to Reville Tire, the Reville Principals, and Mr. Lanci, which were then conveyed to UAS's counsel. *Id.* ¶ 20.

On June 23, 2015, Reville Tire and the Reville Principals (with the exception of Susan Seman) executed the APA. *Id.* ¶ 21; ECF No. 86-1. The individual Plaintiffs signing the APA did so as Reville Tire's "SHAREHOLDERS." ECF No. 114 ¶ 22. James Ranalli, the father, executed the APA on behalf of UAS Hermitage Operations LLC. *Id.* ¶ 21.

UAS Hermitage Operations LLC subsequently assigned its rights under the Asset Purchase Agreement to United Auto Supply of Syracuse, West, Inc. ("UAS"), pursuant to paragraph 19 of the APA. *Id.* ¶ 23. In support of the assignment, UAS cites to its proposed

"First Amendment to Asset Purchase Agreement," ECF No. 86-2, in which UAS states that UAS Hermitage Operations, LLC assigned its rights under the APA to United Auto Supply of Syracuse, West, Inc. ECF No. 114 ¶ 23. UAS also cites to its July 28, 2015 letter to Reville Tire terminating the APA, which also specified that United Auto Supply of Syracuse, West, Inc. is the successor-in-interest to UAS Hermitage Operations, LLC. *Id.*[1]

Pursuant to the terms of the APA, UAS agreed, among other things, to purchase certain (but not all) of the assets of Reville Tire, including but not limited to Reville Tire's inventory ("Inventory"), in exchange for an assumption of certain (but not all) of Reville Tire's liabilities ("Assumed Liabilities") and payment of certain other consideration. *Id.* ¶ 24; ECF No. 86-1 ¶ 1 (Assets), ¶ 2 (Liabilities), & ¶ 3 (Consideration). In the APA, the parties agreed that UAS's assumption of the Assumed Liabilities of Reville Tire would be deemed full consideration for Reville Tire's Inventory. ECF No. 114 ¶ 25; ECF No. 86-1 ¶ 3(a)(iii). The parties also agreed that a "Closing" on the transactions contemplated in paragraph 12 of the APA would only occur upon the satisfaction of certain contingencies set forth in paragraph 8, and after the delivery of certain documents indicated in paragraphs 12(b) & 12(c). ECF No. 114 ¶ 26.

The terms of the APA expressly permitted UAS to conduct due diligence of Reville Tire's operations, including the review of "all material information" that UAS might request regarding the business of Reville Tire, and access to Reville Tire's suppliers and customers. ECF No. 114 ¶ 27; ECF No. 86-1 ¶ 6(a). The APA provides that UAS "shall" conduct due diligence between

---

[1] Reville Tire denies that the cited exhibits support the proposition that UAS Hermitage Operations, LLC assigned its rights under the APA to United Auto Supply of Syracuse, West, Inc., but Reville Tire is otherwise unable to cite to any record evidence to show that the assignment did not take place or is not valid. ECF No. 127 ¶ 23. Reville Tire only cites to deposition testimony of UAS's president, James Ranalli, in which he states that *he* lacks personal knowledge that UAS Hermitage Operations, LLC transferred, sold, or assigned rights to any other UAS entity. *Id. See* ECF No. 128-1 at 14. Reville Tire has not come forth with any competent evidence to dispute that UAS Hermitage Operations, LLC assigned its rights under the APA to United Auto Supply of Syracuse, West, Inc.

the execution date and the Closing, including a review of the business, operations, assets, contracts, legal compliance and future prospects of Reville Tire's business. ECF No. 114 ¶ 28; ECF No. 86-1 ¶ 8(k). The APA also provides that UAS's prepossession of Reville Tire locations begins on the date of the APA and continues until Closing or termination. ECF No. 124 ¶ 3; ECF No. 86-1 ¶ 8(n).

The parties agreed that UAS would take a physical count of the Inventory in a manner determined by UAS, and that the audit of the Inventory shall be conducted using "Pronto Pricing, including discounts." ECF No. 114 ¶ 29; ECF No. 86-1 ¶ 6(f). Reville Tire and the Reville Principals who signed the APA agreed that UAS would have "access to and exclusive possession" of all of Reville Tire's locations for the purpose of conducting its due diligence and for installing any computers or equipment that UAS deemed necessary in order to commence operations immediately upon the closing of the transaction. ECF No. 114 ¶ 30; ECF No. 86-1 ¶ 8(n).

The parties agreed that the Asset Purchase Agreement "may be terminated without further liability of either party at any time prior to the Closing . . . [or] by [UAS] on or prior to the end of the Due Diligence Period if [UAS] is not satisfied with the results of its due diligence investigation in [UAS]'s sole discretion." ECF No. 114 ¶ 31; ECF No. 86-1 ¶ 11. Paragraph 11 of the APA also indicates that "[u]pon the termination of this Agreement for any reason whatsoever, the parties shall be discharged and released from any further rights or obligations [t]hereunder." *Id.* The parties also agreed that Reville Tire and the Reville Principals would "indemnify UAS for any material breach of any representation, warranty or covenant of" Reville Tire and the Reville Principals. ECF No. 114 ¶ 32; ECF No. 86-1 ¶ 10(b).

Reville Tire and the Reville Principals made certain representations and warranties set forth in Paragraph 4 of the APA, titled "Seller's and Each Shareholder's Representations and Warranties." ECF No. 114 ¶ 33; ECF No. 86-1 ¶ 4. Relevant to the instant motion are the following representations and warranties:

- that Reville Tire had the power to own and sell the assets and to vest good and marketable title in them (ECF No. 86-1 ¶ 4(b));

- that the APA's descriptions of Reville Tire's Assets were "complete and accurate descriptions of all assets owned by [Reville Tire] which are used or useful in the operation of the Business," (*Id.* ¶ 4(d)(i))

- that Reville Tire had "good and marketable title to all of the Assets," and has "complete and unrestricted power and right to sell, assign, convey and deliver the Assets to Buyer," (*Id.* ¶ 4(d)(ii))

- that they were not aware of any pending litigation against Reville Tire or any of the Reville Principals, (*Id.* ¶ 4(f));

- that there were no material changes in Reville Tire's financial condition or assets since its last financial statement, (*Id.* ¶ 4(k)(i));

- that the Reville Principals were the owners of the stock of Reville Tire, (*Id.* ¶ 4(l));

- that neither the APA nor any other document furnished by Reville Tire in connection with the APA "contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading in any respect," (*Id.* ¶ 4(u));

- that no representation made in the APA was untrue, (*Id.* ¶ 4(v)); and

- that "[t]here is no fact or circumstance known to [Reville Tire] or each Shareholder which adversely affect the condition (financial or otherwise), properties, assets, liabilities, business, operations or prospects of the Business which has not been set forth in this Agreement or the schedules hereto," (*Id.* ¶ 4(u)).

ECF No. 114 ¶ 33.

The APA includes a continuing obligation of disclosure, including a representation that Reville Tire would not incur any debt, encumber any assets or take any action which would

cause the representations in the APA to be untrue.  ECF No. 114 ¶ 34; ECF No. 86-1 ¶¶ 6(c) & 8(h)-(i).  Reville Tire and the Reville Principals who signed the APA also covenanted that from the date of the APA through the Closing Date, Reville Tire would "not encumber or sell any of the Assets."  ECF No. 114 ¶ 35; ECF No. 86-1 ¶ 6(g)(ii).

With regard to Reville Tire employees the APA provides that UAS "shall not be required to employ any employees of [Reville Tire]," but "[UAS] shall be permitted to interview [Reville Tire's] employees for possible employment with [UAS] at any time between the date [t]hereof and the Closing of the transactions contemplated" by the APA.  ECF No. 114 ¶ 36; ECF No. 86-1 ¶ 14.

The APA also includes a provision that the APA and any attached Exhibits, Schedules, or referenced agreements, is the only agreement between the parties, contains all terms and conditions, and supersedes all prior agreements.  ECF No. 114 ¶ 37; ECF No. ¶ 23(b).  The parties further agreed that the APA may not be modified except by a subsequent writing.  ECF No. 114 ¶ 37; ECF No. 86-1 ¶ 23(c).

The APA included an estimate that Reville Tire's inventory was worth $2.7 million.  ECF No. 114 ¶ 38; ECF No. 86-1 ¶ 3(a)(iii).  The parties memorialized in a Letter Agreement to the APA, dated June 19, 2015, that the parties anticipated that the Assumed Liabilities would be $3.3 million as of the Closing Date.  ECF No. 114 ¶ 39; ECF No. 115 at 525-26.

The APA expressly permitted UAS to contact Reville Tire's creditors in order to negotiate settlements of Assumed Liabilities on behalf of Reville Tire, and that if UAS "is unable to negotiate acceptable settlements with any of the aforementioned creditors prior to the end of the Due Diligence Period, [UAS] shall be permitted to terminate this Agreement and receive a

9

refund of any amounts paid by [UAS] to [Reville Tire] hereunder as of the date of such termination." ECF No. 114 ¶ 63; ECF No. 86-1 ¶ 2(b). The APA also provides that it "shall be construed and interpreted according to the internal laws of the Commonwealth of Pennsylvania, excluding any choice of law rules that may direct the application of the laws of another jurisdiction." ECF No. 114 ¶ 64; ECF No. 86-1 ¶ 22.

### 3. The Due Diligence Period and Termination of the APA

UAS commenced its due diligence and pre-possession activities after the execution of the APA. ECF No. 114 ¶ 48. UAS performed a physical count of Reville Tire's Inventory for purposes of confirming the Inventory's existence and value. *Id.* ¶ 49. Representatives of Reville Tire were present at all times for UAS's inventory count, pre-possession and due diligence efforts. *Id.* ¶ 50. In performing its count of the Inventory, UAS used the agreed-upon Pronto Pricing, the pricing used by a buying group of which both Reville Tire and UAS were members, for parts subject to such pricing. *Id.* ¶ 51; ECF No. 86-1 ¶ 6(f).

During the due diligence period UAS sent a team of approximately 20 or more representatives to Reville Tire locations. ECF No. 124 ¶ 5. Eight people were to conduct the physical inventory. *Id.* Additional UAS employees and representatives also worked on due diligence and prepossession transition matters remotely. *Id.* UAS sent vehicles to Reville Tire locations, which were used to make Reville Tire deliveries. *Id.* ¶ 6. UAS insured Reville Tire vehicles. *Id.* ¶ 7. UAS purchased and installed equipment, including computers, telephones, cameras, and other hardware, in Reville Tire locations. *Id.* ¶ 10. UAS shipped approximately $500,000 worth of inventory to Reville Tire locations. *Id.* ¶ 11.

Before and after the execution of the APA, Reville Tire represented that its Inventory was worth approximately $2,700,000. ECF No. 114 ¶ 52. At the conclusion of UAS's due diligence, UAS's count of Reville Tire's Inventory was approximately $1 million less than the estimate included in the APA. *Id.* ¶ 53. Reville Tire does not admit the accuracy of the UAS count, but does not dispute the record evidence cited by UAS to support its count, nor does it cite to record evidence showing that UAS's count was inaccurate. *See* ECF No. 127 ¶ 53. Reville Tire also argues that UAS improperly conducted the inventory and thus its count was inaccurate. UAS also discovered that Reville Tire's Inventory included goods that Reville Tire had on consignment and did not own. ECF No. 114 ¶ 54.

Before and after the APA, Reville Tire represented that the Assumed Liabilities were in the amount of approximately $3.3 million. *Id.* ¶ 55. Reville Tire acknowledged in an email dated July 24, 2015, that its inventory and accounts payable were not "in line with [the] original agreement of $3.3 [million] in payable and $2.7 [million] in inventory," and that "the gap is approximately $300,000 over the agreed spread." *Id.* ¶ 56; ECF No. 115 at 541-42.

 On July 21, 2015, UAS proposed to amend the APA in writing to, in part, "establish the Assumed Liabilities and correct the Inventory Estimate, such that the Asset Purchase Agreement accurately reflects the facts as they exist on and as of the date of this Amendment." ECF No. 115 at 659-666; ECF No. 114 ¶ 57. On July 23, 2015, Reville Tire and the Reville Principals refused the modification. *Id.* In an email to the Ranalli's, Raymond Reville explained that Reville Tire concluded that UAS's proposed amendments were "more ultimatums than options" and that the parties had "negotiated a fair and equitable contract in good faith and are of the opinion that we need to continue to proceed with the original contract." ECF No. 115 at 632-33.

The parties continued discussions but were unable to resolve their disagreements. ECF No. 114 ¶ 57.

On July 28, 2015, UAS sent notice to Reville Tire and the Reville Principals that it was terminating the APA pursuant to paragraph 11, and cited the unsatisfactory results of its due diligence review. *Id.* ¶ 58.

After the termination of the APA, UAS recovered some, but not all, of the inventory it had shipped to Reville Tire locations. ECF No. 124 ¶ 12. UAS also picked up some of the equipment that it had installed in Reville Tire locations. *Id.* ¶ 13. Reville Tire had debt with parts suppliers, which it settled by shipping certain inventory back to such suppliers and acknowledge in a Settlement Agreement that some of the inventory being returned was inventory to which UAS asserted a claim. *Id.* ¶ 14.

Reville Tire and the Reville Principals have not indemnified UAS for any breach of the APA. ECF No. 114 ¶ 65. After UAS terminated the APA, the Reville Principals discussed and analyzed among themselves, Mr. Lanci, and counsel, whether to resume the business, but ultimately did not resume the business. *Id.* ¶ 59. Reville Tire is now effectively out of business. *Id.* ¶ 61.

### 4. Factual Allegations Regarding Kenneth Lanci's Dealings with Reville Tire

In May of 2015, Reville Tire asked Kenneth Lanci, a self-professed "turnaround expert," to assist with Reville Tire's dire financial circumstances. *Id.* ¶ 11. On May 22, 2015, the Reville Principals assigned all of their ownership shares in Reville tire to RTC II, LLC, an entity owned solely by Mr. Lanci, which made Mr. Lanci the sole shareholder of Reville Tire. *Id.* ¶ 12. The Reville Principals assigned their shares to Mr. Lanci because they wanted him to have the

authority to negotiate with PNC Bank on behalf of Reville Tire. *Id.*

Reville Tire, the Reville Principals, and Mr. Lanci were aware of the PNC Bank lawsuit before the APA was signed on June 23, 2015. *Id.* ¶ 46. On or about June 23, 2015, the Reville Principals authorized Reville Tire to enter into a settlement with PNC Bank. *Id.* ¶ 40; *see also* ¶¶ 7-8. On June 24, 2015, Reville Tire and PNC Bank entered into a confidential settlement agreement pursuant to which Reville Tire agreed to pay PNC Bank $925,000 in exchange for a full and final settlement of the judgment of $1,406,398.31 that had been entered against Reville Tire. *Id.* ¶ 41. Mr. Lanci signed the settlement agreement as the "sole shareholder" of Reville Tire. *Id.* Robert Reville also signed the settlement agreement. *Id.*

On June 23, 2015, Reville Tire executed a promissory note in favor of Mr. Lanci in which it promised to pay Mr. Lanci $925,000, the amount Reville Tire had agreed to pay PNC Bank pursuant to the settlement agreement. *Id.* ¶ 42. As part of this transaction, Reville Tire granted to Mr. Lanci a security interest in its assets, including its inventory. *Id.* After UAS terminated the APA, Mr. Lanci filed an Initial Financing Statement with the Ohio Secretary of State, perfecting his security interest in Reville Tire assets on August 5, 2015. *Id.* ¶ 62.

Reville Tire contends that Mr. Lanci was the sole shareholder of Reville Tire from May 22, 2015, through June 24, 2015, and that at some time thereafter the shares reverted back to the Reville Principals. Neither Reville Tire nor Mr. Lanci has produced any writing documenting the transfer of the Reville Tire shares from Mr. Lanci's company back to the Reville Principals. *Id.* ¶43. Neither Mr. Lanci nor Robert Reville testified that such a writing exists or were able to specify when the shares reverted back to the Reville Principals. *Id.* There is no dispute, however, that Mr. Lanci was the sole shareholder of Reville Tire on June 23, 2015.

At no time did Reville Tire, the Reville Principals or Mr. Lanci reveal to UAS that Mr.

Lanci or his company was ever a shareholder of Reville Tire. *Id.* ¶ 44. At no time did Reville

Tire, the Reville Principals, or Mr. Lanci reveal to UAS that Reville Tire and Mr. Lanci had

agreed to an arrangement whereby Mr. Lanci would lend money to Reville Tire to settle the PNC

Bank judgment in exchange for Mr. Lanci obtaining a security interest in some of the same

assets that Reville Tire and the Reville Principals who signed the APA had agreed to sell to

UAS. *Id.* ¶ 45.

James Ranalli, the president of UAS testified that had he known that the Reville

Principals were not the shareholders of Reville Tire as of May 22, 2015, that Mr. Lanci was the

sole shareholder of Reville Tire, and that Reville Tire would pledge its inventory and other assets

to Mr. Lanci in exchange for his settlement of Reville Tire's debt to PNC Bank, then UAS would

not have entered into the APA. *Id.* ¶ 47; ECF No. 115 at 529, ¶ 11.

C.    **Procedural Background**

Reville Tire filed a Complaint on August 7, 2015, followed by an Amended Complaint

on August 25, 2015. ECF Nos. 1 & 3. Reville Tire filed a Second Amended Complaint on

August 23, 2016. ECF No. 86. UAS filed an Amended Answer to Second Amended Complaint

and Counterclaim on October 25, 2016. ECF No. 101. On November 16, 2015, Reville Tire

filed an Answer to Defendants' Counterclaim. ECF No. 103.

Reville Tire asserts eight claims against UAS. Count I alleges that UAS made intentional

misrepresentations in order to fraudulently induce Reville Tire to enter into the APA. Count II is

a claim that UAS violated the Pennsylvania and Ohio Uniform Trade Secrets Act. Reville Tire

also asserts two claims of tortious interference with contractual/business relations: Count III

concerns interference with Reville Tire employees. Count IV alleges interference with Reville Tire customers.

Count V is a claim of unfair competition. In Count VI, Reville Tire asserts a claim of conversion for UAS's interference with Reville Tire's property rights, and Count VII is a claim of unjust enrichment related to UAS receiving benefits from Reville Tire without compensation. Finally, in Count VIII, Reville Tire asserts a claim for declaratory relief stating that UAS is legally obligated to pay employee wages for the period during which UAS controlled the Reville Tire business.

In its Counterclaim, UAS asserts six causes of action. Count I is a claim of fraudulent inducement against Reville Tire and all individual Plaintiffs based on alleged intentional misrepresentations and omissions designed to induce UAS to enter into the APA. UAS asserts claims of fraud (Count III) and negligent misrepresentation (Count IV) based primarily on the same misrepresentations and omissions. Count II is a breach of contract claim against Reville Tire and seven of the individual Plaintiffs (Susan Seman is not included in this Count as she did not sign the APA). Finally, UAS asserts claims of conversion (Count V) and unjust enrichment (Count VI) against Reville Tire only.

On December 21, 2016, Reville Tire and UAS each filed a motion for summary judgment. ECF Nos. 109, 112. Reville Tire seeks summary judgment on all six of UAS's counterclaims. Reville Tire has not moved for affirmative summary judgment on any claims. UAS seeks summary judgment on Reville Tire's Count I and Count IV. In addition, Defendants seek summary judgment as a matter of law on all counts arguing that the individual Plaintiffs are not entitled to bring a cause of action that lies solely with the Reville Tire Company. UAS also

seeks affirmative summary judgment as to liability only on its claims of fraudulent inducement and breach of contract.

## III.    STANDARD OF REVIEW

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp.*, 477 U.S. at 322, 325; *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir. 2007). Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific

facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Celotex,* 477 U.S. at 323–25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323–24. The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Liberty Lobby,* 477 U.S. at 248–49; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n.3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact -- that is, a fact that would affect the outcome of the suit under the governing substantive law -- will

preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. *Celotex,* 477 U.S. at 322–23. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. *Liberty Lobby*, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (*quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir. 2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## IV.    DISCUSSION

The relevant facts can be summarized succinctly. Reville Tire was in dire financial condition for several years prior to negotiating an agreement whereby UAS would purchase Reville Tire's assets and assume its liabilities. Reville Tire's financial condition was in such

poor shape that the only way that UAS would consider investing its money, expertise, personnel, and equipment was on terms that were favorable to UAS. Reville Tire engaged in an arms-length negotiation with benefit of counsel and with full knowledge of its financial condition and bargaining position. The end result of the negotiations was an agreement that essentially provided for UAS to take over operating Reville Tire.

During the due diligence period UAS discovered a major discrepancy in the value of Reville Tire's Inventory and Liabilities from what was stated in the APA. As a result of this significant discrepancy UAS proposed to amend the APA. Reville Tire rejected the proposed amendments, and UAS exercised its right to terminate the APA.

Reville Tire's position in this lawsuit is that UAS entered negotiations planning to fraudulently induce Reville Tire to execute an agreement while intending to terminate the agreement once UAS had taken operational control of the business.

UAS's position is that it was deceived by Reville Tire. After terminating the agreement UAS discovered several facts Reville Tire did not disclose prior to execution of the APA, nor at any time during the due diligence period. Among these facts are:

- none of the individual Reville Principals who signed the APA were shareholders or owners of Reville Tire at the time they executed the contract;

- the actual sole shareholder at the time of the execution of the APA was RTC II, LLC, whose President was Kenneth Lanci;

- That Lanci lent Reville Tire money to settle the judgment entered against it by PNC Bank, and in exchange Revile Tire granted a security interest to Lanci in Reville Tire's assets, some of which UAS had agreed to purchase and Reville Tire had agreed to sell in the APA.

UAS submits that it had it known these facts it would not have entered into the APA.

The Court will consider UAS's argument that the individual Plaintiffs are not entitled to

bring a cause of action that lies solely with Reville Tire. Next, the Court will discuss UAS's argument that summary judgement as a matter of law is appropriate on Reville Tire's claims of fraudulent inducement and tortious interference with contractual relations regarding Reville Tire's customers. Finally, the Court will address UAS's Counterclaims. UAS seeks affirmative judgment as a matter of law as to liability on its counterclaims of fraudulent inducement and breach of contract, while Reville Tire seeks summary judgment in its favor on all of UAS's counterclaims.

### A. Individual Plaintiffs

UAS moves for summary judgment as to the individual Reville Tire Plaintiffs on each Count arguing that such individuals are not permitted to bring a direct action against a third party for injuries to the corporation. Reville Tire impliedly concedes that UAS is correct and the individual Plaintiffs do not have standing to bring the claims asserted by failing to acknowledge UAS's argument.

"To have standing to sue individually, the shareholder must allege a direct, personal injury – that is independent of any injury to the corporation – and the shareholder must be entitled to receive the benefit of any recovery." *Hill v. Ofalt*, 85 A.3d 540, 548 (Pa. Super. Ct. 2014); *Morison Informatics, Inc. v. Members 1st Fed. Credit Union*, 97 A.3d 1233, 1237 (Pa. Super. Ct. 2014). *See City of Riviera Beach Gen. Employees Ret. Sys. v. Mylan N.V.*, No. 2:15-CV-821, 2016 WL 4367549, at *13 (W.D. Pa. May 10, 2016), *report and recommendation adopted*, No. 2:15-CV-821, 2016 WL 4275822 (W.D. Pa. Aug. 12, 2016); *In re Bruno*, 553 B.R. 280, 286 (Bankr. W.D. Pa. 2016) (*citing Hill*, 85 A.3d at 549) ("if damages to a shareholder result indirectly, as the result of an injury to the corporation, and not directly, the shareholder

cannot sue as an individual"). The claims in the Second Amended Complaint allege injuries against the corporation. Accordingly, the Court will grant UAS's motion for summary judgment as a matter of law as to all claims asserted by the individual Plaintiffs for lack of standing.

**B.     Reville Tire's Fraudulent Inducement Claim**

In Count I of the Second Amended Complaint, Reville Tire asserts a claim of fraudulent inducement against UAS. To recover on a claim of fraudulent inducement Pennsylvania "require[s] proof of the following elements by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275 (3d Cir. 2010); *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005). "The tort of intentional non-disclosure has the same elements as intentional misrepresentation "except in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999).

Reville Tire alleges that both James Ranalli and his son, James Ranalli, III, "acting as agents and on behalf of UAS, made [certain] identified intentional misrepresentations to Reville's Shareholders in an effort to induce Reville to enter in the APA and to afford Defendants access to Reville's assets, facilities, employees and customers." ECF No. 86 ¶ 67. Throughout the Second Amended Complaint, Reville Tire *generally* alleges that UAS

fraudulently induced Reville to execute the APA and never intended to honor it.[2]  Reville Tire's

general fraudulent inducement allegation rests on the following contentions:

- "UAS *promised to purchase* substantially all of Reville's tangible and intangible assets and to assume a very narrow scope of liabilities." *Id.* ¶ 2 (emphasis added); and

- "Reville and its Shareholders signed the APA in complete reliance on Ranalli's [the father] representation and promise, which he made as agent and on behalf of UAS, that UAS *would purchase the assets of the Company*, Ranalli, Jr. [the son] made the same representation on behalf of UAS." *Id.* ¶ 41 (emphasis added).

These contentions do not support a fraudulent inducement claim.  Reville Tire's allegation that

UAS promised to purchase assets and assume specified liabilities, but in fact never intended to

do so, is a straightforward allegation that UAS breached the contract.

To support a fraudulent inducement claim Reville Tire must point to some false, material

misrepresentation that Reville Tire justifiably relied on that is not simply a claim that UAS

promised to honor the terms of the contract but did not.  Viewing the Second Amended

Complaint in a light most favorable to Reville Tire, the Court has identified three potential

allegations of intentional misrepresentations supporting the general claim:

- "During the negotiations, Ranalli [the father] expressed his strong desire to have UAS take possession of Reville's assets and control of Reville's business, to ensure a smooth operational transition at closing." *Id.* ¶ 29.

- "Ranalli [the father] and UAS declined Reville's offer to take responsibility for negotiating with the Company's unsecured creditors." *Id.* ¶ 30.

---

[2] Reville Tire also alleges that the due diligence process, UAS's proposed amendments to the APA, and the termination of the APA were conducted under fraudulent pretenses.  None of the allegations regarding the due diligence process, the proposed amendments, or the termination are germane to Reville Tire's claim that UAS fraudulently induced Reville Tire to execute the APA because all of those events occurred *after* the execution of the APA.

- "Reville was assured by Ranalli [the father] and Ranalli, Jr. [the son] that employees and certain employed members of the family would be retained as UAS employees, and that the business would continue to operate going forward." *Id.* ¶ 33.

UAS argues that Reville Tire's fraudulent inducement claim fails as a matter of law because the claimed misrepresentations are either merged in or superseded by explicit terms in the APA. "Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically covered by the written contract are merged in or superseded by that contract." *Blumenstock v. Gibson*, 811 A.2d 1029, 1035 (Pa. Super. Ct. 2002) (citation omitted). "[P]arol evidence of representations is inadmissible as to a matter covered by a written agreement with an integration clause unless the parties agreed that those representations would be added to the written agreement but they were omitted because of fraud, accident or mistake. *Id. (citing 1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.,* 653 A.2d 663, 666 (Pa. Super. Ct. 1995), *interpreting Bardwell v. Willis Co.,* 100 A.2d 102, 104 (Pa. 1953). *See also Bowman v. Meadow Ridge, Inc.*, 615 A.2d 755, 758–59 (Pa. Super. Ct. 1992) (where alleged oral representations or agreements concern matters dealt with within an integrated written contract "parol evidence to vary, modify or supersede the written contract is inadmissible in evidence").

The APA contains the following integration clause:

> 23. **General Provisions**. This Agreement together with all Exhibits and Schedules hereto, and including all other agreement(s) made a part hereof by reference[]:
>
> > (b) is the only agreement between the parties hereto and contains all of the terms and conditions agreed upon with respect to the subject matter

23

> hereof, and supersedes all prior agreements, understandings or intents among the parties hereto; and
>
> (c)     may not be modified except by a writing executed by both parties hereto.

ECF No. 86-1 ¶ 23.

The APA is an integrated contract covering the entire agreement of the parties and specifically covers the matters Reville Tire alleges were UAS's fraudulent misrepresentations. The agreement concerned the matter of Ranalli's desire to take possession and control of the business as the essence of the APA is that UAS will take possession and control of Reville Tire's business. The APA covers the matter of employment of Reville Tire employees by UAS by explicitly stating that UAS "shall not be required to employ any employees" of Reville Tire. *Id.* ¶ 14. Despite Reville Tire's allegation that UAS declined its offer to negotiate with Reville Tire's creditors, the APA directly states that during the due diligence period UAS "shall be permitted to contact Seller's creditors to whom the Assumed Liabilities are owed for purposes of negotiating settlements." *Id.* ¶ 2(b).

Moreover, given that the matters alleged by Reville Tire were matters covered in in the APA, it would not have been justifiable for Reville Tire to rely on the alleged prior oral misrepresentations in executing the APA. This was an arms-length negotiation between sophisticated parties represented by counsel. Therefore, UAS is correct that Reville Tire's fraud claim fails and summary judgment as a matter of law will be granted as to Count I of the Second Amended Complaint.

Reville Tire ignores UAS's argument that the APA is an integrated contract and therefore evidence of alleged prior oral representations inadmissible. Reville Tire instead emphasizes its

general fraud allegation that UAS never intended to purchase Reville Tire and never intended to

honor the terms of the APA. Reville Tire's argument consists of recounting its allegations of

alleged misconduct committed by UAS *after* execution of the APA as evidence that UAS never

intended to comply with the terms of the APA. Reville Tire never points to any admissible

evidence of a fraudulent misrepresentation by UAS before signing the APA that the Reville

Principals Tire justifiably relied upon in executing the APA. What Reville Tire alleges may

support other causes of action, and Reville Tire has asserted six other claims not being

challenged on summary judgment, but it does not support a fraudulent inducement claim.

### C.  Reville Tire's Claim of Tortious Interference with its Customers

In Count IV of the Second Amended Complaint, Reville Tire claims that UAS

"intentionally, improperly and without privilege or justification interfered with Reville's

contractual and/or business relationships with its customers." ECF No. 86 ¶ 93. Reville Tire

alleges that, after the execution of the APA, UAS improperly informed Reville Tire's customers

that UAS had acquired or taken control of Reville Tire's business and operations and conducted

business with Reville Tire's customers prior to the termination of the APA. *Id.* Reville Tire

alleges that UAS's conduct was "designed and intended to cripple, harm and destroy an integral

part of Reville's business and ensure that Reville would be unable to profitably operate – or

operate at all – following UAS's termination of the APA." *Id.* ¶ 94.

"The elements of a cause of action for intentional interference with a contractual relation,

whether existing or prospective, are as follows: (1) the existence of a contractual, or prospective

contractual relation between the complainant and a third party; (2) purposeful action on the part

of the defendant, specifically intended to harm the existing relation, or to prevent a prospective

relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *RX Home Care, Inc. v. Dubin*, No. 1926 EDA 2012, 2013 WL 11256832, at *3–4 (Pa. Super. Ct. July 29, 2013) (*quoting Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (citations omitted)).

"Pennsylvania has expressly adopted the Restatement (Second) of Torts, which states that a necessary element of this tort is improper conduct by the alleged tortfeasor . . . ." *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (*citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978); and Restatement (Second) of Torts §§ 766-67). When determining whether the interference is improper the Restatement offers the following factors for the Court to consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767. "The general issue is 'whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.'" *Crivelli*, 215 F.3d at 395 (*quoting Adler*, 393 A.2d at 1184 n.17).

UAS argues that Reville Tire is unable to show the absence of privilege or justification on the part of UAS or actual legal damage. UAS argues that the APA gave UAS the right to exclusive possession of the business and the right to meet with its customers, and thus UAS's conduct was properly performed as part of its legally protected interest.

The APA expressly permitted UAS to conduct due diligence of Reville Tire's operations, which included review of "all material information" that UAS might request regarding access to Reville Tire's customers. ECF No. 86-1 ¶ 6(a). The APA also expressly provided that during the due diligence period

- Reville Tire shall permit UAS "full access (during reasonable hours not to interfere with the operations of the Business) to the personnel, facilities, books and records, insurance policies and related records, agreements, customers, permits and licenses of" Reville Tire. *Id.* ¶ 8(k) (emphasis added).

- Reville Tire "shall cooperate with [UAS] in arranging meetings between [UAS's] representatives and [Reville Tire's] customers . . . ." *Id.*

- that UAS shall have "access to and exclusive possession" of all of Reville Tire's locations for the purpose of conducting its due diligence and for installing any computers or equipment that UAS deemed necessary in order to commence operations immediately upon the closing of the transaction. *Id.* ¶ 8(n).

Moreover, UAS points out that Reville Tire consented to UAS's conduct and its' personnel were present for UAS's actions in relation to Reville Tire customers.

The conduct that UAS engaged in with Reville Tire's customers was permitted under the terms of the APA. The APA was a contract whereby UAS would take over Reville Tire. Reville Tire executed the agreement knowing that prior to closing on the APA, UAS was going to begin the process of taking over the business and as a practical matter, it had to engage with customers. In fact, Reville Tire encouraged, participated, or acquiesced in this conduct. The fact that UAS would, in the course of taking over a business, inform existing Reville Tire customers that it was under contract to take over the business is conduct that "should be permitted [under the APA] without liability, despite its effect of [potentially] harm[ing]" Reville Tire in the event that the APA was terminated. *Crivelli*, 215 F.3d at 395.

Viewing UAS's conduct under the Restatement factors supports this conclusion. Restatement (Second) of Torts § 767. UAS's motive was to facilitate a transition from Reville Tire's business operations to UAS. Reville Tire had an interest in assisting UAS in the transition as it too had an interest in ensuring a smooth transition. UAS actions were not in opposition to the terms of the APA. Finally, the relations between UAS and Reville Tire were dictated by the APA and, as long as the parties were performing under the APA, their interests were aligned.

It was only after UAS terminated the APA that Reville Tire sought to view UAS's legitimate conduct with its customers during the due diligence period as a tortious interference. Reville Tire admits that UAS properly gained access to "trade secrets and confidential business information, including customer lists," during the course of the due diligence period. ECF No. 126 at 9. Reville Tire does not argue that gaining access to this information was not justified or privileged; rather Reville Tire explicitly argues that UAS improperly used such information "*after the termination of the APA*" to continue business relations with Reville Tire's customers. *Id.* (emphasis added). *See id.* at 10 (APA does not allow UAS to use confidential information gained in course of parties' relationship to service customers "after termination of the APA"). Reville Tire is correct that there is no provision covering what happens to customers if the parties do not close on the APA. The APA contemplated one of two outcomes: (1) the parties would close on the APA and UAS would complete its takeover of the business; or (2) one of the parties would exercise its rights under the APA to terminate the agreement prior to closing.

Reville Tire's opposition to UAS's motion rests on its allegation that UAS's true "improper conduct" is that it used the APA as a ruse to take over Reville Tire's business without having to pay Reville Tire as agreed in the APA. Again, this allegation may support other causes

of action but it does not support a claim of tortious interference with Reville Tire's relationships with its customers.  Reville Tire is unable to point to a non-privileged act committed by UAS that would amount to a tortious interference with Reville Tire's contractual relationship with its customers and therefore the court will grant UAS's motion to dismiss Count IV of the Second Amended Complaint.

### D.    UAS's Counterclaims

UAS moves for affirmative summary judgment on its fraudulent inducement and breach of contract counterclaims.  Reville Tire moves for summary judgment on all counterclaims.

### 1.  UAS's Fraudulent Inducement, Fraud, and Negligent Misrepresentation Counterclaims

UAS's claims of fraud, fraudulent inducement, and negligent misrepresentation are discussed together as all are based on the allegations that Reville Tire shareholders falsely represented to UAS (i) that each of them were shareholders of Reville Tire at the time the APA was executed; (ii) that Mr. Lanci was in fact the sole shareholder of Reville Tire; and (iii) that Reville Tire intended to pledge its assets to Mr. Lanci in exchange for Lanci settling Reville Tire's debt to PNC Bank.  In addition, the elements required to establish all three causes of action are similar.

As stated previously, a fraud or fraudulent inducement claim in Pennsylvania requires clear and convincing proof of a representation; which is material to the transaction at hand; made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; the intent of misleading another into relying on it; justifiable reliance on the misrepresentation; and the resulting injury was proximately caused by the reliance.  *Eigen*, 874 A.2d at 1185.  "A misrepresentation is material if the party would not have entered into the agreement but for the

misrepresentation." *Id.* at 1186.

Similarly, to establish a claim of negligent misrepresentation requires proof of: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 729 A.2d at 561 (*citing Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994), *citing* Restatement (Second) Torts § 552).

The APA provided that each shareholder represent and warrant to UAS, in part, that the "Shareholders are the owners of all of the issued and outstanding shares of the common capital stock of [Reville Tire]. No other parties hold any options, warrants or other rights with respect to the stock of [Reville Tire]." ECF No. 86-1 ¶ 4(l). The Reville Principals who signed the APA did so as "shareholders," and were so identified as shareholders throughout the APA. There is no dispute that the Reville Principals assigned their shares in Reville Tire to RTC II, LLC, an entity solely owned by Mr. Lanci on May 22, 2015, thereby making Mr. Lanci the sole shareholder of Reville Tire. Mr. Lanci remained as the sole shareholder until at least June 24, 2015, the day after the APA was executed on June 23, 2015.

The APA also provided that each Shareholder represent and warrant to UAS, in part, that there "is no fact or circumstance known to . . . each Shareholder which adversely affects . . . the condition (financial or otherwise), properties, assets, liabilities, business, operations or prospects of the Business which has not been set forth in this Agreement or the schedules hereto." *Id.* ¶ 4(u). Reville Tire does not dispute that Mr. Lanci was granted a security interest in certain Reville Tire assets, including its inventory, on or about June 23, 2015, in connection with the

settlement reached with PNC Bank signed by Mr. Lanci as Reville Tire's sole shareholder. Nor does Reville Tire assert that it informed UAS of this arrangement.

Finally, UAS asserts that had it known that the Reville Principals were not the shareholders of Reville Tire, that Mr. Lanci was the sole shareholder of Reville Tire, and that Reville Tire would pledge its inventory and other assets to Mr. Lanci in exchange for his settlement of Reville Tire's debt to PNC Bank, then UAS would not have entered into the APA. Accordingly, UAS argues that summary judgment as a matter of law should be granted as to liability on its fraudulent inducement claim.

Because Reville Tire does not allege that it informed UAS that the Reville Principals were not shareholders prior to or on the date of execution of the APA, that they had assigned their shares to Mr. Lanci, or that they planned to and did grant Mr. Lanci a security interest in assets, UAS's factual allegations of misrepresentation are undisputed. Reville Tire offers a post-hoc argument that fraudulent inducement could not have occurred since it later transferred ownership of the shares from Mr. Lanci back to the principals (although there is no evidence to support that this in fact happened) and because the side deal with Mr. Lanci requiring encumbering certain assets to resolve an adverse judgment from PNC Bank would have been resolved by the time the parties were ready to close on the APA. Such an argument is a tacit admission that Reville Tire purposely withheld this information and intended to keep it secret in hopes that Reville Tire would be able to reverse its actions without UAS ever discovering the misrepresentations. Reville Tire admits as much by arguing that UAS suffered no harm and therefore there was no foul. ECF No. 109 at 10 (who was a shareholder "made no difference" as "the Reville family owned all shares . . . at the end"); *Id.* at 20 ("the Reville's could never

31

commit fraud, as the APA explicitly requires only that Reville's assets . . . be unencumbered at closing"). *See also* ECF No. 126 at 14, 18.

Reville Tire mischaracterizes UAS allegation that the Reville Principals failed to disclose that they were not shareholders, to a claim that *because* the Reville Principals were not shareholders the APA was not valid. ECF No. 109 at 12-13; ECF No. 126 at 17-18. This argument is irrelevant to UAS's counterclaims. Reville Tire also provides no support for arguing that UAS should have conducted due diligence on Mr. Lanci. UAS was not informed that Mr. Lanci was the sole shareholder or that he had any involvement with the transaction.[3]

The Court also dismisses Reville Tire's argument that Mr. Lanci was only a shareholder for a short time and the misrepresentation was remedied soon after the APA was executed. UAS's allegation is that had it known *before* the APA was executed that the Reville Principals were not in fact shareholders as required by the APA, and that another person was the sole shareholder, then UAS would not have entered into the APA. Failing to provide accurate information about ownership deprived UAS with full and complete knowledge affecting the APA's central purpose of transferring assets. Thus, Reville Tire's argument it was only obligated to ensure that assets were not encumbered at closing is irrelevant. ECF No. 109 at 13; ECF No. 126 at 18-19. Similarly, UAS claims that Reville Tire failed to inform UAS of the Lanci encumbrance *before* the APA was executed, and this information was a material fact that would have caused UAS not to enter into the APA.

Reville Tire implicitly addresses UAS's argument that it was fraudulently induced to

---

[3] Reville Tire's argument also concerns matters extraneous to UAS's fraud claim, such as discussion of representations regarding the value of Reville Tire's inventory and how the inventory was conducted, but these allegations are not relevant to UAS's fraud, fraudulent inducement, and negligent misrepresentation counterclaims. *See* ECF No. 109 at 16-19.

enter into the APA by Reville Tire's failure to inform UAS of the *encumbrance* by re-characterizing UAS's allegation as alleging that Reville Tire failed to inform UAS that it was *Mr. Lanci* who was involved with Reville Tire. ECF No. 109 at 14. Reville Tire's re-characterization of UAS's claim, so as to focus on knowledge of *who* the encumbrance was in favor of, is irrelevant to UAS's actual claim that Reville Tire failed to inform UAS of the encumbrance on its' assets at all. Finally, Reville Tire has not produced sufficient evidence of record to show that there is no genuine dispute that UAS has not suffered damages, whereas UAS has produced record evidence establishing that it did suffer damages.

UAS and Reville Tire engaged in an arm's length negotiation regarding the terms of the APA. The APA required that the individual shareholders represent and warrant that they were in fact the owners of Reville Tire's stock, and that no other party had any rights in the stock, but in truth they were not shareholders and someone else had rights in Reville Tire's stock. The Reville Principals did not disclose this information to UAS prior to execution of the APA. These misrepresentations are material as who actually owns the stock in a company in a negotiation for sale of the assets of the company is a material consideration for a potential buyer. Similarly, the parties negotiated a term in the APA that required that the shareholders represent and warrant that there is no fact or circumstance that adversely affects the Reville Tire's business. Regardless of Reville Tire's motives in not disclosing the intention to encumber assets, this is a material fact a potential buyer would want to be informed of prior to entering into an agreement to purchase the assets.

UAS has established that Reville Tire knowingly made material misrepresentations by omission with the intent that UAS would rely on the misrepresentations. UAS has also

introduced undisputed evidence that had Reville Tire informed UAS before execution of the APA that each of them was not a shareholder, that Mr. Lanci was the sole shareholder, and that they intended to enter into an agreement with Mr. Lanci whereby an interest in the company's assets would be transferred to him, UAS would not have entered into the APA. ECF No. 115 at 529, ¶ 11. UAS has also produced evidence showing that it did suffer monetary injury as a result of its reliance on Reville Tire's misrepresentations. Therefore, summary judgment in favor of UAS and against Reville Tire will be granted as to UAS's fraudulent inducement counterclaim. Reville Tire's motion for summary judgment will be denied as to UAS's fraudulent inducement, fraud, and negligent misrepresentation[4] counterclaims.

### 2. UAS's Breach of Contract Counterclaim

"It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (*citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002).

UAS argues that there are no genuine issues of material fact that Reville Tire and the Reville Principals who signed the APA materially breached the APA in the following ways:

> a. by misrepresenting that the Reville Principals were the owners of the stock of Reville Tire when in fact, they were not;
>
> b. by representing that there were no material changes to Reville Tire's financial condition or assets since its last financial statement when in fact, it pledged its assets to Lanci;

---

[4] UAS's negligent misrepresentation counterclaim is not barred by the gist of the action doctrine as asserted by Reville Tire because UAS's counterclaim concerns Reville Tire's conduct prior to the execution of the APA.

       c. by misrepresenting that they were not aware of any pending litigation despite the existence of the PNC lawsuit;

       d. by misrepresenting that they had complete power to convey the assets to UAS despite the fact that they had previously granted a security interest in the same assets to Lanci;

       e.  by misrepresenting that they had the power to own and sell the assets and to vest marketable title in them despite that the Reville Principals did not own shares in Reville Tire and that the assets were subject to a security interest granted to Lanci;

       f.  by failing to comply with their continuing obligation of disclosure, including the representation that Reville Tire would not incur debt, encumber assets or take any other action that would cause their representations to be untrue; and

       g. by failing to indemnify UAS as a result of their material breaches of the APA.

ECF No. 113 at 21-22.[5]  UAS contends that the above described conduct breached APA

provisions in which Reville Tire and each shareholder represented and warranted as follows:

- that the Reville Principals were the owners of the stock of Reville Tire, ECF No. 86-1 ¶ 4(l);

- that there were no material changes in Reville Tire's financial condition or assets since its last financial statement, *id.* ¶ (k)(i);

- that they were not aware of any pending litigation against Reville Tire or any of the Reville Principals, *id.* ¶ (f); and

- that Reville Tire had "good and marketable title to all of the Assets," and had the power to own and sell the assets and to vest good and marketable title in them, *id.* ¶ 4(b) (Reville Tire warrants and represents that it had "complete power to own and to sell, transfer and deliver all Assets to be transferred hereunder"); and *id.* ¶ 4(d)(ii) (Reville Tire warrants and represents that it had "good and marketable title to all of the Assets," and "complete and unrestricted power and right to sell, assign, convey and deliver the Assets to Buyer").

---

[5] UAS does not seek summary judgment on its counterclaim allegations that Defendants breached the APA by misrepresenting (i) they were not in breach of any other contract, (ii) that the APA did not contain untrue statements, and (iii) that no representation in the APA was untrue.  ECF No. 101 ¶¶ 73(b), (g) & (h).

UAS also contends that Reville Tire's conduct results in two additional breaches. First, the conduct is a breach of the APA's requirement that Reville Tire and the Shareholders have a continuing obligation of disclosure "to promptly notify [UAS] in writing" of any matter discovered after execution of the APA, which if it had been known on the date of execution "would have been required to be" disclosed. ECF No. 86-1 ¶ 6(c). The conduct is also alleged to be a breach of Reville Tire and the Reville Principals' duty to indemnify UAS for "any material breach of any representation, warranty or covenant of [Reville Tire] and/or Shareholders contained herein." *Id.* ¶ 10(b)(ii). Both of these APA provisions require a finding of materiality to qualify as a breach. Paragraph 6(c)'s materiality language is implicit in imposing a continuing obligation to disclose matters that "would have been required to be" disclosed on the date of execution. In other words, an obligation to disclose "material matters." The indemnification provision is explicit in that it is requires a "material breach" for the indemnification obligation to be imposed.

UAS seeks affirmative summary judgment in its favor on its breach of contract counterclaim as to liability only. Reville Tire seeks summary judgment as a matter of law on UAS's breach of contract claim arguing that the APA is an illusory contract and thus cannot be breached. ECF No. 109 at 22-29. The Court finds that the APA is not illusory and that UAS has established that Reville Tire breached the APA.

### a. The APA is not an Illusory Contract

The Pennsylvania Superior Court has addressed the issue of an illusory term in a contract as follows:

 A contract is evidenced by a mutuality of obligation. A mutuality of obligation exists when both parties to the contract are required to perform their respective

promises. If a mutuality of promises is absent, the contract is unenforceable. A promise to perform or to forebear from performing must be supported by consideration. If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable. The promisor has committed him/herself to nothing.

*Geisinger Clinic v. Di Cuccio, M.D.,* 606 A.2d 509, 512 (Pa. Super. Ct. 1992) (internal citations omitted). "'The fact that one party is given an option not accorded to the other does not per se, render such contract void for lack of mutuality of obligation.'" *In re Estate of Rosser*, 821 A.2d 615, 623 (Pa. Super. Ct. 2003)(*quoting Best v. Realty Management Corp.,* 101 A.2d 438, 440 (Pa. Super. Ct. 1953).

Reville Tire bases its argument on two admittedly one-sided provisions in the APA contending that they provide UAS with "entirely optional" promises. Reville Tire points to paragraph 11(b) of the APA, regarding termination of the agreement, which provides in part as follows:

This Agreement may be terminated without further liability of any party at any time prior to the Closing: . . . (b) by [UAS] on or prior to the end of the Due Diligence Period if [UAS] is not satisfied with the results of its due diligence investigation in [UAS's] sole discretion . . . .

ECF No. 86-1 ¶ 11(b). Reville Tire also contends that paragraph 6(f), regarding Inventory, contains an "entirely optional" promise, as follows:

[Reville tire] shall permit [UAS] . . . to take a physical count of the Inventory for purposes of confirming the existence of and valuing such Inventory. The manner of conducting such physical count of the Inventory shall be determined by [UAS] in its sole discretion. Notwithstanding the foregoing, the parties agree that the inventory audit shall be conduct[ed] using Pronto Pricing, including discounts.

*Id.* ¶ 6(f).

The APA is not an illusory contract. Neither of the provisions are "entirely optional" nor do they provide UAS with discretion to completely avoid liability. The termination provision in

paragraph 11(b) includes options for termination of the agreement by both parties. The subsection singled out by Reville Tire provides UAS with an option to terminate that is not accorded to Reville Tire, and does so by affording discretion to UAS. The parties engaged in an arms-length negotiation that included agreeing to a provision that UAS could terminate the agreement if it is "not satisfied with the results of its due diligence investigation in [UAS's] sole discretion." *Id.* ¶ 11(b). This term does not give UAS "the unfettered choice of whether to perform and the absolute, arbitrary right to cancel the agreement without further liability." *Starr v. O-I Brockway Glass, Inc.*, 637 A.2d 1371, 1373 (Pa. Super. Ct. 1994).

Before exercising the option to terminate UAS must have conducted a good faith due diligence investigation and be prepared to articulate a reasonable basis for claiming that it is "not satisfied" with the results of the investigation if it wants to avoid liability for breaching the contract. Thus, the provision itself includes terms that are not optional and are subject to challenge by Reville Tire. In addition, UAS could not rely on paragraph 11(b) to successfully defend a lawsuit by merely stating that it did not desire to conduct a due diligence investigation or by refusing to state a basis for its "not satisfied" conclusion. *Id.* (defendant could not successfully defend suit to compel it to purchase land by stating that it did not desire to do so, but could defend by proving it was unable to secure the third-party transaction that he had the discretion to obtain).

The provision in paragraph 6(f) that UAS conduct a physical count of the Inventory is even more straightforward. UAS must actually take a physical count of the Inventory such that it is able to "confirm[] the existence" of the Inventory and place a reasonable value on the Inventory. ECF No. 86-1 ¶ 6(b). UAS does not have the option not to conduct a physical count

of the Inventory. By providing that the sole means of conducting the Inventory are left to UAS's discretion does not render the APA illusory. Again, UAS cannot avoid liability solely by pointing to the discretion vested in it by paragraph 6(b), nor could UAS successfully defend itself by claiming that it chose to conduct the Inventory in a fanciful or plainly ineffective manner.

Reville Tire may pursue a cause of action based on an allegation that UAS breached the terms of the APA by failing to properly terminate the agreement, failing to act in good faith in conducting a due diligence investigation, failing to properly conduct a physical Inventory, or by failing to provide good faith support for the methods and actions used to take the Inventory. In any of the above hypothetical claims the contract "is sufficiently definite . . . and . . . a reasonably certain basis exists upon which a court could grant an appropriate remedy." *Geisinger,* 606 A.2d at 512. The Court concludes that the discretionary terms "are sufficiently definite to withstand a claim of illusoriness or indefiniteness." *Id.* Accordingly, the Court will deny Reville Tire's motion for summary judgment on UAS's breach of contract claim.

### b. UAS's Affirmative Motion for Summary Judgment

UAS's breach allegations are based on a connected series of events beginning with PNC Bank filing the May 21, 2015 lawsuit against Reville Tire. PNC Bank held a perfected security interest in Reville Tire assets, including but not limited to its inventory and general intangibles. Reville Tire defaulted on a line of credit it had with PNC Bank. On May 28, 2015, judgment was entered against Reville Tire in favor of PNC Bank in the amount of $1,406,398.31, plus interests and costs. The day after the lawsuit was filed, May 22, 2015, the Reville Principals assigned shares to Mr. Lanci's company so that Mr. Lanci, as sole shareholder of Reville Tire, had authority to negotiate with PNC Bank about Reville Tire's defaulted line of credit and

eventual judgment.

On June 23, 2015, Reville Tire, in furtherance of seeking settlement of the judgment against it by PNC Bank, executed a promissory note in favor of Mr. Lanci in which it promised to pay Mr. Lanci $925,000, and granted to Mr. Lanci a security interest in Reville Tire's assets, including its inventory. On June 24, 2015, Reville Tire and PNC Bank entered into a confidential settlement agreement whereby Reville Tire agreed to pay PNC Bank $925,000 in exchange for a full and final settlement of the judgment that had been entered against Reville Tire. June 23, 2015 was also the date the APA was executed.

The above undisputed facts are the basis of UAS's breach of contract claim. Reville Tire implicitly and explicitly admits to the factual conduct supporting the alleged breaches. As discussed below, the Court finds that Reville Tire committed the individual breaches alleged by UAS and that the breaches were material. Central to this finding is the connected events in light of the obligations of the APA. A company contemplating entering into a contract to purchase essentially all of another company's assets and assume nearly all of its liabilities requires accurate and timely information regarding matters such as ownership of the company, ability to convey assets, the financial condition of the company, and its true debts and encumbrances on assets. In this case, Reville Tire's plan appears to have been to surreptitiously and quickly resolve problems it knew would hinder a deal with UAS. Rather than delaying negotiations until it was able to resolve its problems or informing UAS of its true circumstances during negotiations, Reville Tire gambled that it would be able to proceed to the Closing Date without being found out. A reasonable assumption is that Reville Tire did not reveal its conduct because it knew that if it did UAS would not have signed the APA. In addition, besides being denied the

ability to consider its options and analyze the contemplated purchase armed with complete information, UAS was also unable to consider Reville Tire's actions as part of an overall judgment of whether it wanted to go into business with a party who would choose to hide such critical information during negotiations. For all of these reasons, and for the detailed reasons stated below, the Court finds that UAS has demonstrated that there are no genuine issues of dispute that Reville Tire breached the specific provisions of APA as alleged and that Reville Tire's breaches of the APA are material.

### i. Breach of Paragraph 4(f) of the APA

Reville Tire admits that it did not inform UAS of the PNC Bank litigation, but argues that there was no obligation to disclose the information because the litigation was no longer pending on the date the APA was executed. According to Reville Tire, the litigation ceased when confession of judgment was entered against it on May 28, 2015.

The Court disagrees that the entry of a confessed judgment means that litigation has ceased. First, once judgment is entered an appeal period begins, which at a minimum renders any purported claim of finality premature. More significantly, the judgment itself was pending and unsatisfied at the time the APA was signed. Satisfaction of Judgment was entered on the docket on June 26, 2015, two days after the settlement agreement had been reached and three days after the APA was signed. *PNC Bank Nat. Assoc.*, No. 5:15-cv-01024 (N.D. Ohio) (ECF No. 10). In context of this case and under the APA, the Court concludes that the phrase "pending litigation" covers an unsatisfied judgment that included a perfected security interest in Reville Tire assets and inventory such that it was incumbent upon Reville Tire to disclose the litigation at the time of execution of the APA. Therefore, Reville Tire breached paragraph 4(f)

41

of the APA by failing to disclose to UAS the ongoing litigation.

### ii. Breach of Paragraphs 4(b) and 4(d)(ii) of the APA

Next, Reville Tire admits that it did not disclose to UAS that it had previously granted a security interest to Mr. Lanci in certain of its assets, and thus Reville Tire admits that it did not have complete power to convey the same assets to UAS when the APA was executed. It also admits that at the time of execution of the APA it did not disclose to UAS that Reville Tire did not have the power to own and sell the assets and to vest marketable title in them.

Reville Tire opposes the entry of summary judgment as to these alleged breaches by arguing that under the APA, Reville Tire was only required to have good and marketable title to its assets on the closing date. Specifically, Reville Tire points to paragraph 4(d)(ii), which states that "[o]n the Closing Date, [Reville Tire] shall have good and marketable title to all of the Assets . . . ." ECF No. 126 at 21. Because UAS terminated the agreement prior to the closing date, Reville Tire argues that there can be no breach based on its failure to disclose its ownership of, and power to convey, the Assets. The Court disagrees.

Paragraph 4 of the APA, titled "Seller's and Each Shareholder's representations and Warranties," begins with the following general provision:

> Seller and each Shareholder make the following representations and warranties to Buyer, each of which is true and correct *on the date hereof* [and] *shall remain true and correct* to and including the Closing Date . . .

ECF No. 86-1 ¶ 4 (emphasis added). Paragraph 4(b) concerns Reville Tire's representation and warranty as to Reville Tire's "Status," which includes a statement that Reville Tire "*has complete power to own and to sell, transfer and deliver all Assets to be transferred hereunder.*" *Id.* ¶ 4(b). Read together these provisions mean that on the date of execution, and throughout the

existence of the APA, Reville Tire was obligated to represent and warrant that it had good and marketable title to its assets, and the power to own and sell its assets.

Paragraph 4(d)(ii) does state that Reville Tire represent and warrant that "[o]n the Closing Date" it shall have good and marketable title to all of the Assets. Reville Tire would have this provision read in isolation and interpreted to mean that Reville Tire was permitted to encumber its assets in anyway it chose, not disclose the encumbrance, and only be in breach if it were unable to unencumber the assets the day before Closing. Such an interpretation would permit Reville Tire to surreptitiously gamble with the Assets at the heart of the APA in the hopes that it would be able to make things right prior to the Closing Date.

The provision must be read in context of the APA, which was a contract for UAS to purchase Reville Tire's assets and assume its liabilities. In context, this provision means that so long as Reville Tire had previously and completely identified any encumbered assets whether by debt, lien, or otherwise, that Reville Tire had good and marketable title in the encumbered assets on the closing date. Critical to UAS's decision to enter into such a contract is the extent to which Reville Tire in fact had the power to convey the assets at the heart of the APA. Because of Reville Tire's misrepresentations, however, UAS was denied the opportunity to consider the lien in favor of Mr. Lanci, as well as the fact that Reville Tire did not have complete power to own and sell the assets, before coming to a final conclusion as to whether to enter into the APA. Finally, the Court concludes that UAS's exercise of its option to terminate the APA in accordance with the Termination provision does not implicate Reville Tire's initial and continuing obligations regarding representations of Reville Tire's power to own and sell the Assets.

Accordingly, having admitted that it misrepresented to UAS that it had complete power to convey the assets to UAS, and misrepresented that it had the power to own and sell the assets and to vest marketable title in them, Reville Tire has breached paragraph 4(b) and 4(d)(ii) of the APA.

### iii. Breach of Paragraph 4(l) of the APA

Next, Reville Tire admits, as alleged by UAS, that it misrepresented that the Reville Principals were the owners of the stock of Reville Tire when they executed the APA, when in fact, they had assigned their shares to Mr. Lanci. Reville Tire does not argue that this is not a breach of the APA but, instead, argues that it is not a material breach because the Reville Principals were again shareholders one day after the execution of the APA. Putting aside the lack of record evidence that Mr. Lanci transferred his sole ownership in the company back to the Reville Principal's on June 24, 2015 or later, whether the breach was material is only pertinent as to UAS's allegation that Reville Tire breached its obligation to indemnify UAS for "material" breaches. Here, the breach was material as the misrepresentation at the date of execution concerned a matter central to the APA: the power of the Reville Principals to transfer ownership of its assets to UAS. Reville Tire's assertion that the breach was cured within one day (if it can be proven) goes, at best, to damages, which is not at issue in the instant motion. Reville Tire's admission that the Principals mispresented their ownership status to UAS at the date of execution is a breach of paragraph 4(l) of the APA.

### iv. Breach of Paragraph 4(k)(i) of the APA

UAS alleges that Reville Tire represented that there were no material changes to Reville Tire's financial condition or assets since its last financial statement when in fact, it had pledged

its assets to Lanci. The argument Reville Tire presents in opposition is based on a mischaracterization of UAS's breach allegation and irrelevantly focuses on the result achieved by its hidden conduct rather than on Reville Tire's obligations under the APA.[6]

Reville Tire mischaracterizes UAS's allegation as a failure "to disclose that it incurred *more debt* as a result of the note in favor of Lanci." ECF No. 126 at 22 (emphasis added). UAS's actual allegation is that the undisclosed lien to Mr. Lanci was a material change to Reville Tire's financial condition or assets that Reville Tire was required to disclose. UAS makes no allegation regarding the amount of debt, disclosed or undisclosed.

Reville Tire next argues that UAS is in no position to complain about an alleged breach because the overall net effect of the transactions with Mr. Lanci (and Mr. Lanci's with PNC Bank on behalf of the company) was to lower the company's overall debt. *Id.* at 23. Reville Tire argues that a lowered debt, even though the debt was undisclosed and tied to encumbered assets, is not a "material adverse change" to Reville Tire's financial condition or assets and thus there was no breach. This is not accurate. As noted by UAS, Reville Tire "retired a *disclosed* debt and lien [to PNC Bank], and replaced it with a separate, *undisclosed* debt and lien in favor of Lanci . . . ." ECF No. 135 at 5 (emphasis in original). Reville Tire hid from UAS all information regarding the debt and lien. The undisclosed debt and lien qualify as a material change to Reville Tire's financial condition and assets. Under the APA, it is not Reville Tire's decision to make that the undisclosed debt and lien place the company in a better position and therefore there is no requirement to disclose. By keeping this information from UAS, Reville Tire denied UAS the opportunity to perform due diligence on the true value of Reville Tire's

---

[6] Inexplicably, Reville Tire asserts that UAS knew of the PNC Bank debt prior to executing the APA. This has no relevance to UAS's allegation that it was not informed about Reville Tire's debt *to Lanci*, regardless of the connection between it and the PNC Bank debt known only to Reville Tire.

assets and liabilities, and what risk Reville Tire created by the lien in favor of Mr. Lanci.

Accordingly, Reville Tire breached paragraph 4(k)(i) of the APA.

### v. Breach of Paragraphs 6(c) and 10(b)(ii) of the APA

UAS contends that once it is determined that Reville Tire breached the APA, if such

breaches are material, then Reville Tire and the Shareholders also breached its continuing

obligation of disclosure and obligation to indemnify UAS for material breaches. The Court has

found that the above breaches occurred and also finds that the breaches were material.

> To determine materiality, Pennsylvania courts refer to the Restatement (Second)
> of Contracts § 241 (1981), which sets forth the following factors to guide the
> inquiry:
>
>> a) the extent to which the injured party will be deprived of the benefit
>> which he reasonably expected;
>>
>> b) the extent to which the injured party can be adequately compensated for
>> that part of the benefit of which he will be deprived;
>>
>> c) the extent to which the party failing to perform or to offer to perform
>> will suffer forfeiture;
>>
>> d) the likelihood that the party failing to perform or offer to perform will
>> cure his failure, taking account of all the circumstances including any
>> reasonable assurances;
>>
>> e) the extent to which the behavior of the party failing to perform or offer
>> to perform comports with standards of good faith and fair dealing.

*Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1271 (Pa. Super. Ct.

2012) (*citing Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 468 (Pa. Super. Ct. 2003).

The Reville Principals were not the owners of the stock at the time of signing the APA

and did not have power to convey the assets to UAS or the power to own and sell the assets and

to vest marketable title in them. The reason why the Principals did not have ownership was

because they transferred ownership to a third party to allow him to negotiate settlement of a non-final judgment that encumbered Reville Tire assets and inventory. Part of that transaction entailed granting a security interest in the same assets and inventory to the third party. The entire interconnected sequence of events comprising the breaches was conducted secretly and occurred before and after execution of a contract that had as its central purpose the transfer of assets and liabilities from Reville Tire to UAS. For these reasons, and for the reasons explained throughout this Opinion, the Court concludes that all of the breaches committed by Reville Tire were material to the APA. Accordingly, Reville Tire has breached its continuing obligation of disclosure under paragraph 6(c) of the APA, and its obligation to indemnify UAS for material breaches under paragraph 10(b)(ii) of the APA.

### vi. Conclusion

Having found that Reville Tire has breached the APA, UAS's motion for summary judgment will be granted. Summary judgment in favor of UAS and against Reville Tire will be granted as to UAS's breach of contract counterclaim as to liability only.

### 3. Reville Tire's Motion for Summary Judgment on UAS's Conversion and Unjust Enrichment Counterclaims

### a. Conversion

"Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003).

UAS asserts a counterclaim for conversion alleging that it had "provided Reville, at its request, with access to various parts and supplies . . . to ensure Reville Tire could continue to

47

supply its customers," and that UAS owned the parts and supplies at all times. ECF No. 101 ¶¶ 92, 93. UAS alleges that upon termination of the APA, Reville Tire returned some of the parts to suppliers AP Exhaust Products and Centric Parts, in order to reduce Reville Tire's debts to these suppliers. *Id.* at ¶ 94. UAS further alleges that Reville Tire did not compensate UAS for the parts and supplies it provided (except for the sum of $26,000); that Reville Tire had no justification for the conversion; and that UAS did not consent to the conversion. *Id.* ¶¶ 94-96.

Reville Tire argues that summary judgment is appropriate because UAS's inventory was placed voluntarily into Reville Tire's warehouse with UAS's consent. Reville Tire also asserts, without documentary support and contrary to facts it has admitted, that all UAS parts and supplies were returned to UAS after termination of the APA. Consistent with establishing a conversion claim, however, UAS alleges that it did *not* consent to Reville Tire taking a portion of UAS's parts and supplies after termination of the APA and shipping them to other companies to reduce Reville Tire's debt. The conversion claim is not based on an allegation that Reville Tire failed to return parts and supplies to UAS. Reville Tire has not demonstrated that there are no disputed issues of material fact and therefore its motion for summary judgment as to UAS's conversion counterclaim will be denied.

### b. Unjust Enrichment

"The elements of unjust enrichment under Pennsylvania law have been defined as follows: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008) (*citing Limbach Co. LLC v.*

*City of Philadelphia*, 905 A.2d 567, 575 (Pa. Cmwlth. 2006)).

In its counterclaim for unjust enrichment UAS alleges that after the APA was terminated Reville Tire "failed to return the bulk of [the UAS-provided] parts and supplies to UAS." ECF No. 101 ¶ 99. Furthermore, UAS alleges that Reville Tire failed to reimburse UAS for paying certain Reville Tire debts. *Id.* at ¶ 100. Thus, UAS alleges that it has conferred a benefit on Reville Tire and that it would be inequitable for Reville Tire to retain the benefit without paying UAS the value of the benefit. *Id.* at ¶¶ 101, 103.

Reville Tire argues that UAS's claim fails as a matter of law because parties to a contract, like the APA, cannot maintain a claim for unjust enrichment. ECF No. 109 at 29-30. In response, UAS correctly argues that it can maintain its unjust enrichment claim because it is premised on Reville Tire's failure to return the bulk of UAS's parts and supplies after termination of the APA, and that no provision of the APA required that UAS provide Reville Tire with parts and supplies. Moreover, there is no contractual right in the APA for UAS to base a right to recover for the failure of Reville Tire to return parts and supplies to UAS either before or after termination of the APA.

Reville Tire next argues that it did not receive any benefit from UAS's parts and supplies placed in its warehouses because any proceeds from the sale of such inventory was deposited into UAS bank accounts. This is a misplaced argument for two reasons. First, the unjust enrichment counterclaim alleges that Reville Tire failed to return the bulk of UAS equipment to UAS -- equipment that was never sold and thus no proceeds of sale for such equipment exist. In addition, it is undisputed, as UAS alleges, that Reville Tire used UAS's property to settle a Reville Tire debt, which benefited Reville Tire. Accordingly, Reville Tire's motion for summary

49

judgment as to UAS's unjust enrichment claim will be denied.

## V.     CONCLUSION

For the foregoing reasons UAS's motion for summary judgment, ECF No. 112, will be granted and Reville Tire's motion for summary judgment, ECF No. 109, will be denied.  The individual Reville Principal Plaintiffs will be dismissed as to all counts asserted in the Second Amended Complaint.  Counts I and IV of the Second Amended Complaint will also be dismissed.  Summary judgment in favor of UAS and against Reville Tire will be granted as to UAS's fraudulent inducement counterclaim (Count I) and UAS's breach of contract counterclaim (Count II).[7]

An appropriate Order will be entered.

BY THE COURT

/s/ Maureen P. Kelly
MAUREEN P. KELLY
Chief United States Magistrate Judge

Dated: September 21, 2017

cc:      All counsel of record via CM/ECF

---

[7] Accordingly, the claims remaining for adjudication are Reville Tire's claims against UAS for violations of the Pennsylvania and Ohio Uniform Trade Secret Acts (Count II); tortious interference with contractual/business relations relative to Reville Tire Employees (Count III); unfair competition (Count V); conversion (Count IV); unjust enrichment (Count VII); and declaratory relief (Count VIII), and UAS's counterclaims for fraud (Count III); negligent misrepresentation (Count IV); conversion (Count V); and unjust enrichment (Count VI).